OPINION
{¶ 1} Defendant-appellant Judas Casey appeals from his conviction and sentence for Aggravated Burglary. Casey contends that his conviction for Aggravated Burglary is against the manifest weight of the evidence, because the State failed to prove the elements of trespass and theft. Based on the record, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice. To the contrary, we conclude that the weight of the evidence supports a finding that Casey committed trespass and theft offenses. We conclude that Casey's conviction for Aggravated Burglary is not against the manifest weight of the evidence.
 {¶ 2} Casey further contends that he was deprived of a fair trial, because he was denied the effective assistance of counsel. Specifically, Casey contends that defense counsel was ineffective when he failed: (1) to object to the State's misstatement of the law regarding the State's burden of proof; (2) to conduct adequate voir dire of Juror Gintz; and (3) to request a jury instruction that would limit the purpose for which the jury could consider evidence of his drug abuse. We conclude that defense counsel acted reasonably. We are unable to conclude that but for defense counsel's specific actions, the result of the trial would have been different. The evidence of Casey's guilt in the record is overwhelming. For the same reason, we also reject Casey's contention that the trial court should have given a limiting instruction regarding evidence admitted concerning his drug abuse.
 {¶ 3} Casey also contends that he was deprived of a fair trial based on prosecutorial misconduct, because he was prejudiced by the prosecutor's misstatement of the law regarding the State's burden of proof. The prosecutor's statements did not result in plain error. We are unable to find that but for defense counsel's failure to object to the prosecutor's statement of the law regarding the State's burden of proof, the result of the trial would have been different.
 {¶ 4} Casey contends that the trial court erred in ordering him to pay restitution to Victoria Massey in the amount of $300, because the trial court failed to provide a basis for the amount imposed. We agree. The trial court did not inform the parties how it determined the amount of restitution, and there is no evidence in the record supporting the amount of restitution. The State also concedes that the trial court erred in ordering restitution without providing a basis for the amount imposed.
 {¶ 5} Casey contends that his conviction should be reversed, because the cumulative effect of the errors occurring at trial deprived him of his right to a fair trial. Casey's first, second, third, fourth, fifth, and seventh assignments of error lack merit. As a result, no cumulative error deprived Casey of his right to a fair trial.
 {¶ 6} Accordingly, the restitution order is reversed, the judgment of the trial court is affirmed in all other respects, and this cause is remanded for a further hearing on the issue of restitution.
 I {¶ 7} In March, 2002, Judas Casey and Victoria Massey lived together in an apartment at 408 West Norman Avenue in Dayton. Casey allegedly moved out of the apartment at the end of March taking some of his belongings with him. Casey also allegedly visited Massey three or four times at the apartment in April and removed the remainder of his belongings during those visits.
 {¶ 8} In the early morning hours of May 2, 2002, Casey knocked on the front door of the apartment and identified himself when Massey asked. After gaining entry into the apartment, Casey struck Massey several times in the head with his fists. Casey told Massey to go to her bedroom. Massey went to the bedroom, and Casey left the bedroom closing the door behind him. Casey took a television set from the living room and left the premises. When Massey heard the front door close and a car pull away, she left the bedroom, locked the front door, and called the police.
 {¶ 9} Officer Daniel Zwiesler was dispatched to 408 West Norman Avenue. When Officer Zwiesler arrived at the scene, he observed that Massey had a large amount of blood on the left side of her head and a bloody and swollen lip. Massey informed Officer Zwiesler that Casey had knocked on the door asking to come in, and that she told him he could not come in. Massey also informed Officer Zwiesler that Casey then asked for the rest of his belongings, and that she retrieved a pair of Casey's shoes she found in the spare bedroom. Massey told Officer Zwiesler that when she opened the door a crack to hand Casey his shoes, Casey pushed the door open, forcing her inside. Massey informed Officer Zwiesler that Casey then struck her several times in the head with his fists and grabbed her by the hair, dragging her towards her bedroom. Massey told Officer Zwiesler that Casey ordered her to go to her bedroom and told her that if she came out, he would kill her. Massey also informed Officer Zwiesler that she went to the bedroom, and Casey left the bedroom closing the door behind him. Massey told Officer Zwiesler that she heard voices in the living room, and that when she came out of the bedroom, her television set was gone.
 {¶ 10} Massey was then transported to the hospital to be treated for her injuries. While Officer Zwiesler was completing paperwork with Massey at the hospital, Massey gestured toward Casey, who was being brought into the hospital on a gurney. Officer Zwiesler established that Massey was identifying Casey as the perpetrator, and then arrested him for Aggravated Burglary.
 {¶ 11} Detective Marcus Sesslar subsequently interviewed Casey at the jail. Casey gave an oral and written statement to Detective Sesslar. In Casey's written statement, he provided 4830 Dugger Road, Apt. K, as his address. Casey's written statement stated as follows:
 {¶ 12} "I do hereby make the following statement of my own free will and accord concerning this Agg. Burglary which occurred on the 2nd day of May, 2002. This incident occurred on W. Norman at 408 at approximately 0240 hrs. To Whom it May Concern: I went to ex-fiancé [sic] home and knocked on the door. After she let me in, I told her I didn't want her to see me in the state-I was in, she hesitated so I struck her and told her to go into the bedroom. I then grabbed the t.v. and left back out the door; in which I immediately sold for crack. I am guilty of domestic violence and theft."
 {¶ 13} Casey was subsequently indicted on one count of Aggravated Burglary, in violation of R.C. 2911.11(A)(1), a felony of the first degree. Casey was found guilty of Aggravated Burglary by a jury and was sentenced to a five-year prison term. Casey was also ordered to pay court costs and restitution to Massey for economic loss in the amount of $300. From his conviction and sentence, Casey appeals.
 II {¶ 14} Casey's third assignment of error is as follows:
 {¶ 15} "Appellant's conviction was against the manifest weight of the evidence."
 {¶ 16} Casey contends that his conviction for Aggravated Burglary is against the manifest weight of the evidence, because the State failed to prove that he committed the offenses of trespass and theft, elements of the offense of Aggravated Burglary.
 {¶ 17} When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, citation omitted. A conviction should be reversed and a new trial ordered "only in the exceptional case in which the evidence weighs heavily against the conviction." Id.
 {¶ 18} Casey was convicted of Aggravated Burglary, in violation of R.C. 2911.11(A)(1), which states as follows:
 {¶ 19} "No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another[.]"
 {¶ 20} Trespass is defined in R.C. 2911.21(A)(1), which states that "[n]o person, without privilege to do so, shall * * * knowingly enter or remain on the land or premises of another[.]" R.C. 2901.01(A)(12) defines privilege as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity."
 {¶ 21} Casey first argues that his case is analogous toState v. O'Neal (1995), 103 Ohio App.3d 151, 155,658 N.E.2d 1102, which holds that "in the absence of a restraining order or an order granting one party exclusive possession of the marital residence, the question of whether one spouse has the sole possessory interest in the house depends on whether the evidence shows that both parties had made the decision to live in separate places. Both parties must have understood that the possessory interest of one was being relinquished, even if it was relinquished begrudgingly or reluctantly. In the absence of such a showing, there can be no finding of trespass and, hence, no aggravated burglary." We find O'Neal to be inapplicable to this case, because Casey and Massey were not married and did not have a marital residence. In addition, there is no evidence that Casey's name was on a lease to the apartment. Massey testified that there was no written lease with Casey's name on it, and there was no testimony to the contrary.
 {¶ 22} Casey contends that the State failed to prove that he committed a trespass, because there was evidence that he was privileged to enter the apartment. Casey argues that he was privileged to enter the apartment, because he resided there, in the sense that his belongings remained there, he continued to receive mail there, and he paid rent there.
 {¶ 23} Laquada Casey, Casey's sister, and Victor Phillips, Casey's brother, both testified that Casey resided at 408 West Norman Avenue on May 2, 2002. Laquada and Victor also testified that Casey's belongings remained in the apartment at that time. Laquada and Victor testified that Massey returned Casey's belongings to their mother's house after May 2, 2002. Laquada and Victor testified that Casey received mail at the apartment. However, Victor testified that Casey also received mail at 4830 Dugger Road, Apartment K, their mother's address. Laquada testified that Casey paid part of the rent for the apartment at 408 West Norman Avenue.
 {¶ 24} Although Massey testified that Casey did receive mail at her address, she also testified that it was because he had not executed a change of address. Massey testified that Casey did not pay any of the bills. She also testified that on May 2, 2002, she lived at 408 West Norman Avenue by herself, and that Casey did not live there. Massey testified that there was no written lease with Casey's name on it. She testified that although Casey had been living there, he moved out of the apartment at the end of March, 2002, taking some of his belongings with him. She testified that Casey visited her three or four times in April and removed the remainder of his belongings during those visits, but did not sleep over. Massey also testified that she never returned additional items of Casey's to Casey's family. She testified that during the months of April and May, Casey was never at the apartment when she was not there. Massey also testified that Casey did not have keys to the apartment.
 {¶ 25} Massey further testified that Casey called her on May 2, 2002, and asked if he could come over, but Massey told him no. Massey testified that shortly thereafter, Casey knocked on the front door of the apartment and identified himself when Massey asked. Massey testified that she told Casey that she had told him not to come over, and Casey then asked for the rest of his belongings. Massey testified that she retrieved Casey's only remaining item, a pair of shoes, she found in the spare bedroom. Massey testified that when she opened the door a crack to hand Casey his shoes, Casey pushed the door open striking her in the face and forcing her inside.
 {¶ 26} Based on the record, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice. To the contrary, we conclude that the weight of the evidence supports that Casey committed a trespass. In addition to Massey's testimony, Casey's written statement that "I went to ex-fiancé [sic] home and knocked on the door," is inconsistent with Casey's contention that he lived there. It is unlikely Casey would knock or refer to the apartment as Massey's home, if he lived there. It is also undisputed that Casey called Massey to get permission to come over to the apartment, which is also inconsistent with Casey's living at the apartment. It is unlikely Casey would call to get permission to enter the residence, if he resided at the apartment. Even if Casey had permission to be in the apartment, Casey does not deny striking Massey, and his privilege to remain in the apartment terminated when he commenced his assault on Massey. See State v. Morton, Cuyahoga App. No. 79436, 2002-Ohio-813, at ¶ 50.
 {¶ 27} Casey also contends that the State failed to prove he committed theft, because the television was rented from Rent-A-Center, and there was no documentation presented showing whether he or Massey had made payments on the television.
 {¶ 28} Massey testified that when she came out of the bedroom after hearing Casey leave the apartment, she noticed that the television was missing from her living room. Although Massey testified that the television was being purchased through Rent-A-Center, she also testified that Casey was not making payments on the television. Theft involves depriving an "owner" of property. It is not necessary that the "owner" have title to the property, so long as the owner has possession or control of it. R.C. 2913.01(D). Detective Sesslar testified that Casey told him that he took the television and sold it for crack cocaine. Detective Sesslar also testified that Casey admitted to him that he was guilty of theft. Casey not only admitted in his written statement that he "grabbed the t.v. and left back out the door," but he also admitted that he was guilty of theft.
 {¶ 29} Detective Sesslar also testified that Casey admitted to him that he was guilty of domestic violence. Officer Zwiesler testified that when he arrived at the apartment, Massey had a large amount of blood on the left side of her head and a bloody and swollen lip, and that Massey informed him that Casey had hit her several times in the head. Massey testified that when pushing open the door, Casey struck her in the face and then he proceeded to hit her several times in the head. In his written statement, Casey admitted striking Massey and admitted that he was guilty of domestic violence.
 {¶ 30} R.C. 2911.11(A)(1), Aggravated Burglary, requires that the State prove Casey acted with the "purpose to commit in the structure * * * any criminal offense." The State presented evidence that Casey committed two separate criminal offenses, domestic violence and theft, by offering the testimony of Massey, Officer Zwiesler, and Detective Sesslar as well as Casey's written statement in which he admits he is guilty of domestic violence and theft.
 {¶ 31} Based on the record, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice. We conclude that the jury's conclusion that Casey trespassed in Massey's apartment with the intent to commit theft, domestic violence, or both, is not against the manifest weight of the evidence.
 {¶ 32} Casey's third assignment of error is overruled.
 III {¶ 33} Casey's first, fourth, and fifth assignments of error are as follows:
 {¶ 34} "Appellant was denied effective assistance of counsel and deprived of a fair trial when defense counsel failed to object to the prosecutor's misstatement of the state's burden of proof."
 {¶ 35} "Appellant was denied a fair trial through ineffective assistance of counsel during voir dire."
 {¶ 36} "Appellant was deprived of a fair trial through his counsel's ineffective assistance in failing to request an `other acts' jury instruction and through the trial court's failure to provide this instruction to the jury."
 {¶ 37} We evaluate claims of ineffective assistance of counsel under the two-part test provided in Strickland v.Washington (1984), 466 U.S. 668. "In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness and that, but for counsel's errors, the result of the proceeding would have been different." State v. Stevens,
Montgomery App. No. 19572, 2003-Ohio-6249, at ¶ 33, citingStrickland, supra; State v. Bradley (1989),42 Ohio St.3d 136, 142, 538 N.E.2d 373.
 {¶ 38} Defense counsel's failure to object waives all but plain error. State v. Ballew, 76 Ohio St.3d 244, 251,1996-Ohio-81, 667 N.E.2d 369. Counsel's failure to object "`constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise.'" Id.
 {¶ 39} Casey first contends that defense counsel was ineffective when he failed to object to the State's misstatement of the law regarding the State's burden of proof.
 {¶ 40} During voir dire, the prosecutor made the following statements regarding the State's burden of proof:
 {¶ 41} "MS. BURKE: Okay. Some of the other people have been jurors may know. But there's a burden of proof that the State has to prove all the elements of the case. The judge will explain to you what that burden of proof is, and he'll explain the elements.
 {¶ 42} "But I'm sure you've heard on TV beyond a reasonable doubt? Everybody else heard that term?
 {¶ 43} "All right. I like to make it kind of like a football field where you start at one end and you go to the other. If you go all the way and make a touchdown, that's like a hundred percent. That's beyond no doubt. I like to say reasonable doubt is kind of like 75 percent. Somewhere — 75 and 90. Now, you're not going to hold me to going all the way for a touchdown, are you?
 {¶ 44} "PROSPECTIVE JUROR SCHROEDER: No.
 {¶ 45} "MS. BURKE: You are not going to hold me to like the 10-yard line?
 {¶ 46} "PROSPECTIVE JUROR SCHROEDER: No.
 {¶ 47} "MS. BURKE: You understand that we got to make — to go back a line, what — the judge gives you a definition of reasonable doubt.
 {¶ 48} "PROSPECTIVE JUROR SCHROEDER: Yes.
 {¶ 49} "MS. BURKE: Everybody else understand that? Everybody will hold me to that line? Okay."
 {¶ 50} We agree with Massey that the prosecutor's attempt to quantify proof beyond reasonable doubt was not a correct statement of the law.
 {¶ 51} Defense counsel did not object to the prosecutor's statements regarding the State's burden of proof. However, "`[f]ailure to object to error, alone, is not enough to sustain a claim of ineffective assistance.'" State v. Campbell,69 Ohio St.3d 38, 53-54, 1994-Ohio-492, 630 N.E.2d 339, citation omitted. Competent counsel may reasonably hesitate to make an objection in the jury's presence, because objections may be considered technical and bothersome by the jury and may tend to disrupt the flow of a trial. Id. at 53.
 {¶ 52} Although defense counsel did not object to the prosecutor's statements regarding the State's burden of proof, he did address the prosecutor's statements during voir dire. Defense counsel stated as follows:
 {¶ 53} "MR. REILING: * * * Now, let's talk a little about reasonable doubt. As the prosecutor correctly pointed out, the judge at the end of this case is going to tell you all about reasonable doubt, going to tell you that it's a high standard, going to tell you that the State has to prove each of these elements of aggravated burglary beyond a reasonable doubt.
 {¶ 54} "And, you know, try as we may, there's no magic formula or percentage that we can attest to that tells us exactly where that is. Okay? It's not 75 percent or 85 percent. Can't be based on a football field."
 {¶ 55} Both defense counsel and the prosecutor informed the jury that the judge would define the State's burden of proof. At the beginning and the end of the trial, the trial court informed the jury that the State had the burden of proving that Casey was guilty of Aggravated Burglary beyond a reasonable doubt. The trial court then defined reasonable doubt as follows:
 {¶ 56} "Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge.
 {¶ 57} "Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs."
 {¶ 58} Before the trial began, the judge instructed the jury that "[i]t is the duty of the judge to instruct you in the law. And it is your duty to follow the law as I will state it to you both now and at the conclusion of all the evidence." At the end of the trial, the judge instructed the jury that he would provide the instructions of the law, and that it was their "sworn duty to accept these instructions and to apply the law as it is given to [them]." The trial court further instructed the jury that they were "not permitted to change the law nor to apply [their] own conception of what [they thought] the law should be."
 {¶ 59} We conclude that defense counsel's failure to object was reasonable. Not only did defense counsel later address the prosecutor's statements during voir dire, but the trial court properly instructed the jury on the State's burden of proof at the beginning and the end of the trial, as both parties informed the jury the trial court would do. Defense counsel was not ineffective for failing to object.
 {¶ 60} We are also unable to find that but for defense counsel's failure to object to the prosecutor's incorrect characterization of the law regarding the State's burden of proof, the result of the trial would have been different. Based on the evidence previously reviewed under section II above, the evidence of Casey's guilt is overwhelming.
 {¶ 61} Casey also contends that defense counsel was ineffective, because defense counsel's voir dire of Juror Gintz was inadequate. Specifically, Casey contends that defense counsel failed to adequately question Juror Gintz on his prior involvement in a grand jurors' association, which may have caused Juror Gintz to be biased. Casey also contends that defense counsel also failed to adequately question Juror Gintz on his family's involvement in police and prison-related work, which also may have caused Juror Gintz to be biased. Casey further contends that defense counsel failed to conduct adequate voir dire regarding the use of medication by Juror Gintz, which may have affected his jury service.
 {¶ 62} During voir dire, the prosecutor asked the prospective jurors if they had any prior jury experience. Juror Gintz stated that he was involved in a grand jurors' association in New York prior to 1975. The prosecutor then asked the following question:
 {¶ 63} "MS. BURKE: * * * For those that have been jurors before, you understand everything you learned, liked, didn't like, hated, or whatever in that experience is completely different than today and the rest of this week? Everybody understand that?
 {¶ 64} "Everything the judge told you back then could be different now. The laws could have changed. Jurisdictions are different. Grand jury proceedings are different than criminal trials.
 {¶ 65} "So you understand you need to put all that aside and judge today and the next couple days on its own merits.
 {¶ 66} "Will everyone that's been a juror be able to do that?
 {¶ 67} "I see that everyone [sic] shaking their head yes.
 {¶ 68} "Anyone that can't do that? No."
 {¶ 69} During voir dire, the prosecutor asked the prospective jurors if they had friends or family in law enforcement. Juror Gintz stated as follows:
 {¶ 70} "PROSPECTIVE JUROR GINTZ: My brother runs the fugitive squad from Suffolk County, New York. I have three nephews who are New York City police. I have a nephew on Daytona Beach police. My son works for the Bureau of Prisons. He's a lieutenant.
 {¶ 71} "MS. BURKE: Okay. Obviously, I assume you talk to them about what their job duties entail, things like that.
 {¶ 72} "PROSPECTIVE JUROR GINTZ: Oh, yeah.
 {¶ 73} "MS. BURKE: Are you going to put that aside, keep that separate and apart from today?
 {¶ 74} "PROSPECTIVE JUROR GINTZ: Yes."
 {¶ 75} During voir dire, the prosecutor also asked Juror Gintz the following:
 {¶ 76} "MS. BURKE: * * * Mr. Gintz, I see in your questionnaire you're taking some medication that makes you drowsy.
 {¶ 77} "PROSPECTIVE JUROR GINTZ: Occasionally. I didn't take it today.
 {¶ 78} "MS. BURKE: Okay. Do you think it's going to be a problem to kind of stay awake and pay attention?
 {¶ 79} "PROSPECTIVE JUROR GINTZ: No.
 {¶ 80} "MS. BURKE: Where [sic] you retired from, sir?
 {¶ 81} "PROSPECTIVE JUROR GINTZ: Worked for UPS. I'm on disability."
 {¶ 82} In questioning the prospective jurors, the trial court asked "is there any one of you who has a disability which might prevent you from serving as a juror, impair your ability to serve, or for which you could request an accommodation in order to enable you to better serve?" Juror Gintz did not indicate that he had a disability which would prevent him from serving as a juror or impair his ability to serve or for which he needed special accommodations.
 {¶ 83} Defense counsel's questioning on voir dire does not have to be in a particular form, and specific questions need not be asked. State v. Coleman, 85 Ohio St.3d 129, 135,1999-Ohio-258, 707 N.E.2d 476. Defense counsel has discretion when questioning jurors during voir dire and does not have to repeat questions already asked by the prosecutor or the judge. Id. Trial strategy decisions made by defense counsel during voir dire will not be second-guessed by an appellate court. Id.
 {¶ 84} The prosecutor asked the prospective jurors if they would be able to set aside their prior jury experience, and Juror Gintz indicated that he could. The prosecutor asked Juror Gintz if he would be able to set aside his family's involvement in police- and prison-related work, and Gintz responded affirmatively, indicating that he would not be biased. The prosecutor asked Juror Gintz if it was going to be a problem for him to stay awake and pay attention, and Gintz responded that it would not, indicating that his jury service would not be affected. The trial court asked if anyone had a disability impairing their ability to serve or preventing them from serving as a juror, and Juror Gintz indicated that he did not.
 {¶ 85} The prosecutor also asked the jurors to raise their hands if they could not be fair and impartial in this case, and Juror Gintz did not raise his hand. Defense counsel asked the jurors if there was anything that would cause them to believe that they could not be fair and impartial or that would make them biased against Casey. Juror Gintz did not indicate that he could not be fair and impartial, or that he would be biased against Casey.
 {¶ 86} We conclude that defense counsel's voir dire of Juror Gintz was reasonable. Defense counsel did not need to repeat pertinent questions already asked by the prosecutor. SeeColeman, 85 Ohio St.3d at 135. In addition, defense counsel did ask if there was anything that would cause the jurors to believe that they could not be fair and impartial or that would make them biased against Casey, to which Juror Gintz indicated that there was not. Defense counsel's questioning did not have to be of a particular form or consist of specific questions. See id. We will not second-guess defense counsel's trial strategies. See id. We are also unable to find that but for defense counsel's failure to adequately question Juror Gintz during voir dire, the result of the trial would have been different. Defense counsel was not ineffective in his voir dire of Juror Gintz.
 {¶ 87} Casey also contends that defense counsel was ineffective when he failed to request a jury instruction that would limit the purpose for which the jury could consider evidence of his drug abuse. Casey argues that the evidence of his abuse of crack cocaine incited the jury to convict based upon past misconduct. Casey further contends that the trial court should have given a limiting instruction regarding the evidence of his drug abuse, because the evidence was highly prejudicial.
 {¶ 88} "While this court has recognized that a defendant is entitled to an appropriate instruction limiting the scope of a jury's consideration of potentially prejudicial evidence that is admitted for a very limited purpose, we have also recognized that a defendant may decide, as a matter of trial strategy, not to request a limiting instruction because of concerns that it will only emphasize in the juror's minds the evidence of other criminal acts committed by defendant to which the instruction applies, thereby reinforcing the prejudice." State v. Tisdale,
Montgomery App. No. 19346, 2003-Ohio-4209, at ¶ 48, citation omitted.
 {¶ 89} Throughout the trial, a few references to Casey's abuse of crack cocaine were made. Defense counsel also addressed Casey's drug abuse during voir dire.
 {¶ 90} "MR. REILING: * * * Now, in this case, on a serious note, you're going to hear testimony that at the time of this alleged offense my client was deeply involved in drugs. I know we talked about that earlier. Specifically, crack cocaine.
 {¶ 91} "Does that fact — it's going to be a fact in this case, unfortunately — make you feel that Mr. Casey is less believable because he was in the throes of crack? I know we talked about drugs before. Anything about that that would make him or his version of the story less believable to you all?
 {¶ 92} "PROSPECTIVE JUROR DINSMORE: Does to me, yes. I've seen people under the influence of crack cocaine.
 {¶ 93} "MR. REILING: Okay. You feel that affects their truthfulness?
 {¶ 94} "PROSPECTIVE JUROR DINSMORE: Absolutely.
 {¶ 95} "MR. REILING: Okay. Anyone else feel that way? You do, sir?
 {¶ 96} "PROSPECTIVE JUROR BURKE: You bet.
 {¶ 97} "MR. REILING: You do, sir?
 {¶ 98} "PROSPECTIVE JUROR LEWIS: (Nodding.)
 {¶ 99} "MR. REILING: You do, ma'am?
 {¶ 100} "Whoever feels that way, raise their hand. Okay. Okay. I'm not doing too good.
 {¶ 101} "Okay. I appreciate your honesty, because that is going to be a fact in this case.
 {¶ 102} "* * *
 {¶ 103} "MR. REILING: * * * Now, in terms of just some final thoughts, since counsel here went into some detail about your histories, is there anything that you heard today or that I've brought up, counsel has brought up, or the judge has brought up that would cause you to believe that you could not fairly and impartially give the defendant his constitutional rights to a trial? Fair trial. Anything that you've heard that would make you in any way biased against Mr. Casey? Including the drug usage that we've admitted to.
 {¶ 104} "PROSPECTIVE JUROR DINSMORE: The drugs.
 {¶ 105} "MR. REILING: That would cause you to have a little problem trying the case.
 {¶ 106} "PROSPECTIVE JUROR DINSMORE: Uh-huh.
 {¶ 107} "MR. REILING: Anyone else because of the drugs.
 {¶ 108} "Okay. As a closing remark, we appreciate that, and without all of your honesty, today here, we wouldn't know whether we had an opportunity to give Mr. Casey a fair trial."
 {¶ 109} Thereafter, prospective jurors Lewis, Dinsmore, and Burke admitted that they could not be fair and impartial and were excused for cause.
 {¶ 110} We conclude that defense counsel's failure to request a limiting jury instruction was reasonable. The prospective jurors, who admitted that they could not be fair and impartial, were excused for cause. During defense counsel's voir dire, the remaining jurors indicated that they could be fair and impartial, and that there was nothing that would make them biased against Casey. In addition, the trial court instructed the jury that "[t]he defendant is presumed innocent until his guilt is established beyond a reasonable doubt. The defendant must be acquitted unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of the offense charged in the indictment." The trial court defined reasonable doubt and evidence and instructed the jury on each element of the crime of Aggravated Burglary. It was reasonable for defense counsel to decide, as a matter of trial strategy, not to request a limiting instruction, because of concerns that it would only emphasize in the juror's minds the evidence of other criminal acts committed by Casey to which the instruction applies, thereby reinforcing the prejudice. See Tisdale, supra. We are also unable to conclude that but for defense counsel's failure to request a limiting jury instruction on the evidence of Casey's drug abuse, the result of the trial would have been different. Defense counsel was not ineffective for failing to request a limiting jury instruction.
 {¶ 111} For the same reason, we reject Casey's contention that the trial court should have given a limiting instruction regarding the evidence of his drug abuse. Because Casey failed to request this jury instruction in the trial court, he waived all but plain error. State v. Williams, Montgomery App. No. 16715, 1999 WL 129488, at *5, citation omitted. We are unable to find that the outcome of the trial would have been different even if the trial court had given a limiting instruction regarding Casey's drug abuse.
 {¶ 112} Therefore, Casey's first, fourth, and fifth assignments of error are overruled.
 IV {¶ 113} Casey's second assignment of error is as follows:
 {¶ 114} "Appellant was deprived of a fair trial through prosecutorial misconduct."
 {¶ 115} Incorporating his argument made in his first assignment of error, Casey contends that he was deprived of a fair trial, because he was prejudiced by the prosecutor's misstatement of the law regarding the State's burden of proof.
 {¶ 116} "The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights." State v. Lynch,98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 145, citation omitted. However, defense counsel's failure to object waived all but plain error. As previously discussed in section III, the prosecutor's statements did not result in plain error. We are unable to find that the outcome of the trial would have been different despite the prosecutor's statements regarding the State's burden of proof.
 {¶ 117} Therefore, Casey's second assignment of error is overruled.
 V {¶ 118} Casey's sixth assignment of error is as follows:
 {¶ 119} "The court erred in ordering restitution to the complainant for a leased television set."
 {¶ 120} Casey contends that the trial court erred in ordering him to pay restitution to Massey in the amount of $300, because the trial court failed to provide a basis for the amount imposed. Casey argues that there is no evidence in the record showing the actual value of Massey's economic loss.
 {¶ 121} The State concedes that the trial court erred in ordering restitution without providing a basis for the amount imposed. However, the State contends that Casey failed to object to the trial court's order of restitution and therefore, waived it for purposes of appeal.
 {¶ 122} Although there was no objection made by Casey, "[w]e * * * have never required a defendant to object to the sentence imposed by the court as a condition of raising a sentencing error on appeal." State v. Carson, Greene App. No. 2002-CA-73,2003-Ohio-5958, at ¶ 33. Pursuant to R.C. 2929.18, "the court may order restitution by the offender to the victim of the offender's crime * * * in an amount based on the victim's economic loss. This section also provides that the trial court shall determine the amount of restitution to be made by the offender at the sentencing. * * * The amount of restitution ordered must bear a reasonable relationship to the loss suffered." Id. at ¶¶ 33-34, citation omitted. It is plain error for the trial court to order restitution without evidence to support the amount of restitution ordered. See id. at ¶ 35.
 {¶ 123} At Casey's sentencing, the trial court set "restitution for postrelease control purposes in the amount of $300 to Victoria Massey." The trial court did not inform the parties how it had determined the amount of restitution. There is also no evidence in the record supporting the amount of restitution. Accordingly, Casey's sixth assignment of error is sustained.
 VI {¶ 124} Casey's seventh assignment of error is as follows:
 {¶ 125} "The cumulative effect of the errors occurring at trial deprived appellant of a fair trial."
 {¶ 126} Casey contends that his conviction should be reversed, because the cumulative effect of the errors occurring at trial deprived him of his right to a fair trial. As noted above, however, Casey's first, second, third, fourth, and fifth, assignments of error lack merit. Casey's conviction for Aggravated Burglary is not against the manifest weight of the evidence. Casey was not deprived of a fair trial due to ineffective assistance of counsel, because defense counsel was not ineffective for failing to object to the prosecutor's misstatement of the State's burden of proof. Casey was not deprived of a fair trial due to ineffective assistance of counsel, because defense counsel was not ineffective in conducting voir dire of Juror Gintz. Casey was not deprived of a fair trial due to ineffective assistance of counsel, because defense counsel was not ineffective for failing to request a limiting jury instruction regarding Casey's drug abuse. Casey was not deprived of a fair trial due to prosecutorial misconduct.
 {¶ 127} We find no cumulative error in this record of a magnitude that would have deprived Casey of his right to a fair trial. Casey's seventh assignment of error is overruled.
 VII {¶ 128} Casey's first, second, third, fourth, fifth, and seventh assignments of error having been overruled, and his sixth assignment of error having been sustained, the trial court's order of restitution is reversed, the judgment of the trial court is affirmed in all other respects, and this cause is remanded for a further hearing on the issue of restitution.
Brogan and Wolff, JJ., concur.